IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| KENNETH G. LANE, | ) | CIVIL ACTION 4:06-1070-TLW-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| MICHAEL J. ASTRUE,[1] | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended,

42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of

Social Security, denying plaintiff's claim for Disability Insurance Benefits (DIB). The only issues

before the Court are whether the findings of fact are supported by substantial evidence and whether

proper legal standards have been applied.  This case was referred to the undersigned for a report and

recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

## I.  PROCEDURAL HISTORY

Plaintiff, Kenneth G. Lane, filed applications for DIB on July 11, 2002, alleging disability

beginning June 28, 2001, due to back pain and depression. (Tr. 30, 31, 44, 57, 512). His applications

were denied initially and upon reconsideration. (Tr. 57, 64-65, 90). Following a hearing on

---

[1]  Michael J. Astrue became the Commissioner of Social Security on February 12, 2007.
Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be
substituted for Commissioner Jo Anne B. Barnhart as the defendant in this suit.

September 19, 2005, (Tr. 508-545), the Administrative Law Judge (ALJ), Albert A. Reed, found

in a decision dated November 22, 2005, that plaintiff was not disabled because he had the residual

functional capacity (RFC) to perform a significant range of light work. (Tr. 17-27). As the Appeals

Council denied plaintiff's subsequent request for review of the hearing decision on February 23,

2006, (Tr. 6-9), the ALJ's decision was the Commissioner's "final decision" for purposes of judicial

review.


## II.  FACTUAL BACKGROUND

The plaintiff was born on December 17, 1972, and was 32 years of age at the time of the

hearing before the ALJ. (Tr. 512). He has a limited education in that he completed the seventh grade

and quit school in the eighth grade, and past work experience as a welder, mechanic, and

construction worker.


## III.  DISABILITY ANALYSIS

In his brief, plaintiff argues that the ALJ's hypothetical to the VE was defective, the ALJ

erred in finding that he retained the physical capacity to perform light work, the ALJ improperly

evaluated his subjective testimony about the disabling effects of his pain, the ALJ failed to consider

the side effects of the plaintiff's medications on his ability to work, and the ALJ minimized or

ignored the seriousness of plaintiff's depressive disorder. (Plaintiff's brief).

In the decision of November 22, 2005, the ALJ found the following:

      1.      The claimant has met the insured status requirements for Title
              II benefits through December 31, 2006.

2.      The evidence reflects the claimant worked after the date in which he alleged he became disabled (Exhibits 3D, 4D, 5F/14).

3.      The medical evidence establishes the claimant's diagnosed post laminectomy syndrome, chronic back pain, and depression are "severe" impairments as defined in the regulations, but not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulation No. 4.

4.      The claimant's allegations concerning his ability to work are less than fully credible.

5.      The claimant has retained the residual functional capacity to perform light work, as defined in the regulations, with restrictions that require simple, routine work in a low stress environment (defined as requiring few decision); occasional interaction with the public; occasional balancing, stooping, kneeling, crouching, and crawling; occasional climbing of stairs or ramps; no climbing of ladders, ropes, or scaffolds; a sit/stand option of one hour at a time; and avoidance of working around hazards such as unprotected heights and dangerous machinery. (20 CFR §404.1545).

6.      The claimant is unable to return to his past relevant work as a welder, mechanic, or construction worker. (20 CRF § 404.1565).

7.      The claimant is a 32 years of age, which is defined as a "younger individual"(20 CFR §§ 404.1563).

8.      The claimant has a limited education. (20 CFR §§ 404.1564).

9.      The claimant has the residual functional capacity to perform a significant range of light work. (20 CFR 404.1567).

10.     Although the claimant's exertional and/or nonexertional limitations do not allow him to perform the full range of light work, using medical Vocational Rule 202.18 as a framework for decision making, there is a significant number of jobs in the national economy that he could perform. Examples include the light, unskilled jobs of bench worker, packer, and assembler, with over 130,000 such jobs in the national economy; and the sedentary, unskilled jobs of table worker,

hand packer, and sorter, with over 130,000 such jobs in the national economy.

11.    The claimant is not under a "disability," as defined in the Social Security Act and regulations. (20 CFR 404.1520).

(Tr. 26-27).

The Commissioner argues that the ALJ's decision was based on substantial evidence and that the phrase "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 390-401, (1971). Under the Social Security Act, 42 U.S.C. § 405 (g), the scope of review of the Commissioner's final decision is limited to: (1) whether the decision of the Commissioner is supported by substantial evidence[2] and (2) whether the legal conclusions of the Commissioner are correct under controlling law. Myers v. Califano, 611 F.2d 980, 982-83 (4th Cir. 1988); Richardson v. Califano, 574 F.2d 802 (4th Cir. 1978). "Substantial evidence" is that evidence which a "reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 390. Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The Court's scope of review is specific and narrow. It does not conduct a de novo review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence. 42 U.S.C. § 405 (g) (1982); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

The general procedure of a Social Security disability inquiry is well established. Five questions are to be asked sequentially during the course of a disability determination. 20 C.F.R. §§ 404.1520, 1520a (1988). An ALJ must consider (1) whether the claimant is engaged in substantial

---

[2]Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).

gainful activity, (2) whether the claimant has a severe impairment, (3) whether the claimant has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1), (4) whether the claimant has an impairment which prevents past relevant work and (5) whether the claimant's impairments prevent him from any substantial gainful employment.

Under 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See 20 C.F.R. § 404.1505(a); Blalock, 483 F.2d at 775.

If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. § 404.1503(a). Hall v. Harris, 658 F.2d 260 (4th Cir. 1981). An ALJ's factual determinations must be upheld if supported by substantial evidence and proper legal standards were applied. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

A claimant is not disabled within the meaning of the Act if he can return to his past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82-62. The claimant bears the burden of establishing his inability to work within the meaning of the Social Security Act. 42 U.S.C. § 423 (d)(5). He must make a prima facie showing of disability by showing he was unable to return to his past relevant work. Grant v. Schweiker, 699 F. 2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. Id. at 191.

## IV. MEDICAL REPORTS

The undersigned has reviewed the medical records and finds many of the reports relevant to the issues in this case. The medical records as set out by the defendant have not been seriously disputed by the plaintiff. Therefore, the undisputed medical evidence as stated by the defendant is set forth herein, in part.

The record showed that a large pipe fell on plaintiff's back at work on June 28, 2001. In July 2001, he presented to Andrew Floren, M.D., for evaluation and treatment. Dr. Floren instructed plaintiff to return to work with restrictions, prescribed medications, and recommended an MRI study (Tr. 111-12). The MRI, performed on July 23, 2001, showed that plaintiff had a small disc bulge at the L4-5 disc level, herniated nucleus pulposus at the L5-S1 disc level, and mild canal and neural foraminal narrowing, compression of the L5 and S1 nerve roots, and lumbar spinal stenosis (narrowing of the spinal canal) (Tr. 122).

On August 9, 2001, Andrew Rhea, M.D., evaluated plaintiff and concluded his symptoms were "somewhat consistent with S1 radiculopathy." He recommended a trial of outpatient physical therapy and prescribed muscle relaxant medication (Tr. 164-65). On August 24, 2001, Aimi Nash,

a physician's assistant, excused plaintiff from working at his request until August 31, 2001 (Tr. 162-63). On August 31, 2001, Dr. Rhea noted that plaintiff's radiculopathy was "modest" and improving with therapy, and excused him from work for four to six more weeks (Tr. 157, 161).

In October 2001, plaintiff saw Edward Behling, M.D., who diagnosed "fatigue, multiple stressors, [and] back pain." Dr. Behling said that plaintiff was "unable to work and [was] somewhat upset by this." He also noted that plaintiff was taking pain medicine and muscle relaxers on a regular basis throughout the day, both of which could cause sedation (Tr. 268).

 Dr. Rhea found that plaintiff's back and leg pain were unimproved despite physical therapy, medications, and bed rest. After plaintiff declined surgery, Dr. Rhea excused him from work for four more weeks, and recommended epidural steroid injections, which were administered this same month (Tr. 123-24, 156-58).

In November 2001, Dr. Rhea administered additional epidural steroid injections and recommended surgical intervention for plaintiff's back and leg pain (Tr. 123-24, 154). On January 23, 2002, plaintiff underwent right L5-S1 laminotomy and nerve root decompression surgery (Tr. 130-36, 172-73). The following day, Dr. Rhea stated that plaintiff's prognosis was guarded and prescribed Percocet (a narcotic) (Tr. 128).

In February 2002, Dr. Rhea stated that plaintiff "seemed to be doing well" with "noted improvement in the pain in his right leg" and "good neurologic function." He prescribed Percocet again (Tr. 152).

On March 4, 2002, Dr. Rhea found that plaintiff had "marked improvement in his right leg pain" and his back pain was stable. Upon examination, he found that plaintiff had negative straight leg raise testing, satisfactory strength, and a pars defect (vertebral fracture) at the L4-5 level. He also

recommended physical therapy (Tr. 151-52). Physical therapy notes dated from March 8 to 29, 2002, indicated that plaintiff tolerated therapy exercises well and reported decreased pain (Tr. 142-44).

Plaintiff also attended physical therapy from April 3 to April 10, 2002, reporting decreased pain with therapy exercises (Tr. 138, 141-42). On April 11, 2002, an MRI study of plaintiff's lumbar spine showed mild degenerative disc changes, probable disc herniation, and enlarged nerve root at the L5-S1 disc level and neural foraminal narrowing at the L4-5 disc levels due to mild disc bulging (Tr. 169). An MRI study of plaintiff's left hip showed slight femoral head asymmetry and no evidence of joint fluid or avascular necrosis (tissue death) (Tr. 170).

In May 2002, an x-ray and myelogram of plaintiff's lumbar spine showed conjoined L5 and S1 nerve roots on the right and epidural lipomatosis (excessive fat deposits) in his lumbar and sacral spine (Tr. 166-68). Plaintiff returned to Dr. Rhea, who found plaintiff's examination was unchanged since his previous visit and concluded he had reached maximum medical improvement with a 20% impairment rating (Tr. 147). Dr. Rhea treated plaintiff's pain with Celebrex (an anti-inflammatory) and refused to prescribe any more Percocet (Tr. 146).

On June 5, 2002, plaintiff underwent a functional capacity evaluation where evaluators concluded he lifted "in the medium category of work" and tolerated frequent sitting, standing, and walking and occasional trunk bending, overhead reaching, pushing, pulling, and repetitive reaching (Tr. 174-78). This same month, Dr. Behling referred plaintiff for psychiatric evaluation at his request and prescribed a trial of Paxil (an anti-depressant) (Tr. 265).

In July 2002, plaintiff presented to Judith Kern, a licensed practical counselor, for depression and chronic pain. Plaintiff reported that Paxil helped him sleep better. Ms. Kern diagnosed a mood

disorder due to a medical condition and assigned a Global Assessment of Functioning (GAF) score of 60 (Tr. 232-33).

In September 2002, plaintiff reported to Dr. Behling that his depressive symptoms were improved with medication and counseling (Tr. 264). Charles Jones, M.D., a State agency medical consultant, reviewed the evidence and concluded that plaintiff could perform light work that did not require climbing of ladders, ropes, or scaffolds, or more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling (Tr. 389-96). Plaintiff presented to Kailash Kumar Narayan, M.D., a neurosurgeon, for evaluation of his back and leg pain. Dr. Narayan found that plaintiff demonstrated slow and painful gait. He also found that plaintiff had normal motor strength, sensation, and reflexes. He could find no structural cause for plaintiff's symptoms and advised him to "be as active as possible" (Tr. 180-81).

On October 2, 2002, plaintiff reported to Ms. Kern that, at one point, he stopped taking his medications. He also reported that Duragesic pain patches (a transdermal narcotic) were "very helpful" (Tr. 228-29).

Between October 29 and November 12, 2002, plaintiff visited Hugh Thompson, M.D., an anesthesiologist, for his back and leg pain. Dr. Thompson stated that he did not think plaintiff's pars defect resulted in any instability nor did he believe that it was the source of his pain. Rather, he postulated that plaintiff's conjoined nerve root and probable fibrosis caused his symptoms. Plaintiff reported that Duragesic patches and Soma (a muscle relaxer) provided significant relief of his symptoms. A nerve conduction study of plaintiff's lower extremities was "essentially normal" (Tr. 339-40), and an x-ray of his lumbar spine showed a partial pars defect at the L5 level but was

otherwise normal (Tr. 341). Dr. Thompson diagnosed post laminectomy syndrome, prescribed Amitriptyline (an anti-depressant), and recommended an epidurogram (Tr. 333).

Between November 22 and 24, 2002, plaintiff underwent a psychological evaluation by E. Selman Watson, Ph.D. Dr. Watson administered the Minnesota Multi-phasic Personality Inventory–Second Edition (MMPI-2), noting that plaintiff's responses generated an invalid profile as a result of his inconsistencies in marking items measuring the same content. Dr. Watson also administered the Personality Assessment Inventory (PAI), which showed plaintiff produced strong elevations on scales measuring anxiety, depression, and somatic concerns. He stated that plaintiff's disorder "resulted in some vegetative symptoms which he found especially painful" and noted that, although plaintiff reported some improvement in his conditions, he was "motivated to consolidate additional gains" (Tr. 184-225).

On November 26, 2002, plaintiff underwent an epidural steroid injection (Tr. 331-32). In December 2002, plaintiff reported a positive response to the injection, and Dr. Thompson continued to prescribe Duragesic patches, Soma, ibuprofen, and Amitiptyline (Tr. 328, 330). At counseling sessions with Ms. Kern in January 2003, plaintiff reported that his "pain seem[ed] to be at [a] point where he [could] handle it" (Tr. 226-27).

In April 2003, Avie Rainwater, Ph.D., evaluated plaintiff to see if he would benefit from biofeedback-assisted relaxation therapy. Dr. Rainwater recommended biofeedback therapy, participation in the Traumatic Injury Group, and individual psychotherapy for plaintiff (Tr. 237, 239-40, 242-43, 245). Plaintiff saw Dr. Thompson and reported that his low back pain was "not getting any worse but not getting any better" and that Duragesic patches "work[ed] out for him pretty well." Dr. Thompson adjusted plaintiff's medications (Tr. 325).

On May 1, 2003, plaintiff began seeing Erika Miller, a counselor, for his depression. She found plaintiff's mood and affect were mildly depressed, diagnosed depression secondary to a general medical condition, and recommended continued supportive counseling (Tr. 255). On May 6, 2003, a State agency medical consultant, reviewed the evidence and concluded plaintiff could perform light work that did not require more than occasional climbing, balancing,  stooping, kneeling, crouching, and crawling (Tr. 363-70). During the remainder of this month, plaintiff saw Dr. Behling, who treated him for "vague" chest discomfort and persistent elevated blood pressure with medications (Tr. 263). He also saw Ms. Miller, who at several visits, found that plaintiff's mood was improved and his anxiety was "mild" (Tr. 251, 253, 278).

In June 2003, W. Pearce McCall, Ph.D., a State agency psychological consultant, reviewed the medical evidence and found that plaintiff was moderately limited in his abilities to carry out detailed instructions, maintain attention and concentration, complete a normal workday or workweek, interact appropriately with the general public, respond to changes, travel to unfamiliar places, and set realistic goals. He concluded plaintiff could perform simple tasks in a low-stress and low-public contact work environment (Tr. 360-62). Ms. Miller noted that plaintiff had a "brighter affect," was active in church, and spent time with his sons (Tr. 248).

Dr. Behling's July 2003 treatment notes showed that plaintiff's hypertension and depression responded to medications (Tr. 262). During July 2003, plaintiff also saw Dr. Rainwater, reporting he had difficulty doing his biofeedback relaxation exercises at home because he "just [couldn't] get the time with his kids there" (Tr. 403). Plaintiff saw Ms. Miller, who noted some improvement in his symptoms and activity levels (Tr. 246, 401, 404).

In August 2003, plaintiff complained of chest pain, which Dr. Behling concluded was likely related to gastric reflux. Dr. Behling prescribed medications (Tr. 261). Plaintiff continued biofeedback therapy with Dr. Rainwater, who by the end of the month, proposed that plaintiff replace his oral pain medications with relaxation techniques (Tr. 407-08, 411-13).

Dr. Behling treated plaintiff's gastric reflux and hypertension with medications in September 2003 (Tr. 260). Dr. Rainwater also continued treating plaintiff, noting on one occasion that plaintiff reported that he helped a friend move but "most[ly] swept" (Tr. 416-17, 419, 421, 423).

Plaintiff continued biofeedback therapy in October 2003 with Dr. Rainwater and reported he was "doing very well," sleeping well, and had "dramatically reduced his medication use." He also rated his pain at an average of 3/10 (Tr. 425-29, 432-34). Ms. Miller saw plaintiff in October and November 2003, and noted some improvement in his symptoms (Tr. 431, 436-38).

In November 2003, plaintiff presented to Lisa Mancuso, M.D., for evaluation of his back, hip, and leg pain. He reported that he had not experienced suicidal ideation in over a year. He also reported that he did not use Duragesic patches on a constant basis. Dr. Mancuso found that plaintiff had lumbar tenderness and decreased ranges of motion and full bilateral lumbosacral strength (Tr. 314-17).

In April 2004, plaintiff saw Dr. Behling for follow-up on his hypertension and depression. He also complained of fatigue and gastric reflux. Dr. Behling prescribed Wellbutrin (an anti-depressant) and adjusted plaintiff's other medications (Tr. 259). He also continued to see Ms. Miller, who noted improvement in his mood and activity levels (Tr. 452-54).

In May 2004, plaintiff underwent lumbar facet joint injections by Dr. Thompson (Tr. 306-07). He also saw Dr. Behling and reported that "overall he [had] been doing well." He reported that he

-12-

had not had any visual disturbances, chest pain, exertional dyspnea, and that he was exercising more which was helping his back pain. He also reported increased energy level since starting Wellbutrin. Dr. Behling continued plaintiff's medications (Tr. 258). Plaintiff also saw Ms. Miller, who found that he had stable mood and affect and adequate coping abilities (Tr. 455).

Ms. Miller saw plaintiff again in June 2004, noting improved symptoms (Tr. 456-57). In July 2004, Dr. Thompson prescribed Zanaflex (a muscle relaxer) after plaintiff complained of increased back pain and reported that Soma was no longer effective (Tr. 301-02). This same month, Dr. Rainwater and Ms. Miller noted that plaintiff was "ambivalent about returning to work" and his mood was stable. They also noted that he was fairly physically active (Tr. 458).

In January 2005, plaintiff saw Dr. Thompson, who prescribed Diclofenac (a narcotic), and saw Ms. Miller for counseling (Tr. 289, 463-64). Plaintiff also presented to the McLeod Regional Medical Center emergency room with complaints of worsening back pain. Erik Dehlinger, M.D., noted that plaintiff could walk around the examination room. He found plaintiff had "very mild" lumbar tenderness. He also found plaintiff had no respiratory, cardiac, or neurological abnormalities. Dr. Dehlinger administered a pain shot, which improved plaintiff's symptoms, prescribed Dilaudid (a narcotic), and discharged plaintiff (Tr. 480-89).

In February 2005, a lumbar MRI study showed that plaintiff had mild postsurgical changes and bilateral pars defects and right sided disc herniation at the L5-S1 level with L5 nerve root compression within the foramen (Tr. 338). Plaintiff saw Ms. Miller for counseling, who noted that his mood was improved and his pain was managed adequately (Tr. 465). Dr. Thompson added chloral hydrate (a sedative) to plaintiff's medication regimen (Tr. 285-86).

-13-

In April 2005, plaintiff presented to Dr. Thompson for medication refills and reported that his back pain was unchanged and he was still limited in his activities. Dr. Thompson suggested that plaintiff attend Florence Darlington Technical College for training in another occupation that would be compatible with his condition and plaintiff said he would consider it. Plaintiff also reported that Duragesic patches and Amitriptyline relieved his pain and Choral Hydrate helped him sleep. Dr. Thompson found that plaintiff had no muscle wasting in his right leg. He refilled plaintiff's medications (Tr. 490).

On July 20, 2005, Dr. Rainwater noted that plaintiff previously agreed on a very specific behavioral plan for better functioning and returning to work and that plaintiff failed to comply with almost every part of the plan. Dr. Rainwater diagnosed depression, mixed pain disorder, and noncompliance and instructed plaintiff to keep a log of how long and far he walked, how often he practiced his relaxation exercises, and how often he took his medications. He also instructed plaintiff to stop taking Dilaudid, only take his other medications as directed, and see a neurosurgeon (Tr. 472).

On August 8, 2005, after plaintiff failed to attend an appointment, Dr. Rainwater "spoke frankly with [Plaintiff] about his lack of compliance and how this [was] just another example of his incomplete effort." He said that plaintiff was inconsistent with his treatment and plaintiff admitted he did better when he was compliant. Plaintiff initially stated he wanted to be discharged until Dr. Rainwater advised him he would be discharged as "noncompliant," after which plaintiff requested another chance (Tr. 474). On August 10, 2005, plaintiff told Dr. Rainwater that he "felt fine." Dr. Rainwater told plaintiff that future treatment depended on his compliance (Tr. 473).

-14-

## V.  PLAINTIFF'S SPECIFIC ARGUMENTS

Plaintiff argues that the ALJ did not properly assess the severity of plaintiff's depression for which plaintiff has received ongoing treatment since 2002. Plaintiff argues that the ALJ ignored the evidence of record. Plaintiff asserts he reported to his physicians on numerous occasions that he has decreased energy, can only work a short period of time without needing a rest break, is easily distracted, and had a change in weight due to loss of appetite. Specifically, plaintiff argues that the counselors and Dr. Rainwater concluded plaintiff suffers from anxiety and depression but that the ALJ found that "plaintiff's depression results in no more than mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace on complex tasks and detailed instructions but can attend to simple tasks for at least two hours at the time with normal work breaks and without special supervision." (Plaintiff's brief)

Defendant argues that in August 2002, Ms. Kern found plaintiff's mood was stable with some depressive symptoms and that he was coping well. Defendant contends that Ms. Miller consistently stated that plaintiff's symptoms were improved and stabilized with therapy. Defendant asserts that in June 2003, Dr. McCall found plaintiff could perform simple tasks in a low-stress and low-public contact work environment even though moderately limited in higher mental functions. Therefore, defendant argues the findings supported the ALJ's conclusion that plaintiff could perform simple, routine work in a low stress environment with only occasional interaction with the public.

A review of the hearing decision reveals the ALJ concluded the following with respect to plaintiff's depression:

> The claimant testified he still has problems with depression, for which he takes Paxil, and that he has disrupted sleep. While his depression is considered a "severe"

-15-

impairment, there is no evidence of bipolar or manic syndrome or chronic problems with anhedonia, appetite disturbance, decreased energy, feelings of guilt, thoughts of suicide, hallucinations, delusions, or easy distractability. There is no evidence that he experiences recurrent and severe psychological disturbances. In fact, the medical evidence showed the claimant denied hav[ing] any depression for over a year. The evidence also showed his depression was under good control. While the claimant may have some possible limitations in functioning under stressful situations, he has the ability to understand, remember, and carry out short, simple instructions although he may have difficulty with detailed instructions. He has the ability to ask simple questions for clarification and seek assistance as necessary, maintain acceptable standards of neatness and cleanliness, use public transportation, and recognize and avoid normal workplace hazards. The claimant's activities of daily living, which include a variety of activities that involve the ability to persist, concentrate, and take on substantial responsibility, demonstrate his depression is not disabling.

. . .

I have discussed above the medical evidence concerning the claimant's depression and find that the evidence, as considered under Section 12.04 of the Listings, substantiates that such disorder results in no more than mild restrictions of activities of daily living and mild difficulties in maintaining social functioning. He may have moderate difficulties in maintaining concentration, persistence or pace on complex tasks and detailed instructions but should be able to attend to and perform simple tasks throughout the work day for at least two hours at a time with normal work breaks and without special supervision. I find no evidence of episodes of related decompensation or extended duration. His mental impairment does not impose limitations meeting any of the "C" criteria. This limits the claimant to simple, routine work in a low stress environment [one requiring few decisions] with only occasional interaction with the general public.

(Tr. 22-24).

There is substantial evidence to support the finding of the ALJ with respect to plaintiff's depression. In September 2002, plaintiff reported that Paxil was definitely working, that his energy level was better, his sleep was improved, and his mood swings, crying spells, and depressive symptoms had dramatically improved. Records from McLeod Psychiatric Associates dated July 18, 2002, through January 31, 2003, reveal plaintiff was diagnosed with major depression but that it improved on Paxil, improving his sleep, mood, and had no suicidal ideations. In August 2005, Dr.

-16-

Rainwater noted that the plaintiff had missed an appointment and that he spoke with the claimant about his lack of compliance and how this is just another example of his incomplete effort. Dr. Rainwater further noted that plaintiff had been inconsistent with his treatment and that plaintiff admitted that he was better when he was compliant. Plaintiff stated that he wanted to be discharged from care but after Dr. Rainwater told him he would be discharged as "noncompliant," plaintiff requested another chance. On August 10, 2005, it was noted plaintiff stated that he was feeling fine and further treatment was contingent upon his compliance.

Further, plaintiff argues that the ALJ did not properly consider the opinion and conclusions of Dr. McCall as to his limitations. However, a review of Dr. McCall's mental residual functional capacity assessment reveals he found plaintiff not significantly limited in all areas except for moderately limited in the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to interact appropriately with the general public, the ability to respond appropriately to changes in the work setting, the ability to travel in unfamiliar places and the ability to set realistic goals or make plans independently of others. (Tr. 360-361). As previously stated, the ALJ concluded plaintiff retained the mental residual functional capacity to perform only "simple, routine work in a low stress environment (which I define as requiring few decision) with only occasional interaction with the public." Thus, it appears from the record that the ALJ considered plaintiff's depression and there is substantial evidence to support his findings and limitations as a result of plaintiff's depression.

Plaintiff next argues that the ALJ did not properly assess his credibility specifically based on his efforts to obtain pain relief which should have enhanced his credibility. Defendant contends that the ALJ properly considered plaintiff's subjective complaints and properly concluded that they were not credible. Defendant asserts that the ALJ considered plaintiff's allegations that he was unable to stand for very long, sit for more than 30-35 minutes, bend, and walk without his legs giving out. However, defendant argues the ALJ was not required to accept these allegations without question. Defendant asserts that plaintiff's subjective testimony regarding the severity of his symptoms was not consistent with the medical evidence.

Additionally, plaintiff argues the ALJ minimized or ignored the side effects of the plaintiff's medications and how these affected his ability to work and that the ALJ violated SSR 96-8p in not considering the effect of his insomnia and hypertension due to chronic pain on his ability to work. Defendant asserts that the ALJ considered the evidence and properly inferred that plaintiff's insomnia and hypertension did not significantly limit his ability to perform and plaintiff's allegations of disabling medication side effects were impugned by his testimony that he could drive his car after he took his pain medications.

In assessing complaints of pain, the ALJ must (1) determine whether there is objective evidence of an impairment which could reasonably be expected to produce the pain alleged by a plaintiff and, if such evidence exists, (2) consider a plaintiff's subjective complaints of pain, along with all of the evidence in the record. See Craig v. Chater, 76 F.3d 585 (4th Cir. 1996); Mickles v. Shalala, 29 F.3d 918 (4th Cir. 1994). A claimant's allegations of pain itself or its severity need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be

-18-

expected to cause the pain the claimant alleges she suffers. A claimant's symptoms, including pain, are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

The ALJ cited numerous reasons for finding that plaintiff's credibility was not without question. For instance, the ALJ concluded that:

> In stark contrast to his testimony that his pain is a dull ache, he later testified his pain has been a 7-8 on a scale of 1-10 for the last three years. This testimony regarding the severity of his back pain over the last three years is quite inconsistent with the medical evidence, which demonstrates the claimant reported significant improvement in his pain and rate it as low as a 2 and 3 during his treatment. The records reflect his pain improved to the point that he "drastically" reduced his medication. The claimant stated he went to therapy but did not like it because the people talked about things that were of no interest to him, and the records show the claimant was not compliant with his therapy. He testified his pain is worse when he stands and walks. He said he can stand a little while then gets stiff, can sit for 30-35 minutes then has to move around; and that he has problems bending and with his leg giving out. However, the claimant was not using an assistive device of ambulation or stability at the hearing, and the physical examination consistently showed the claimant had 5/5 strength in his lower extremities as well as no neurological abnormalities. A nerve conduction study and a lower extremity venous Doppler were normal and showed no lower extremity impairment. There is no evidence the claimant has had any significant problems with swelling in his lower extremities. The claimant was denied narcotic medication, and the evidence shows he reported his pain was stable and manageable. The evidence shows he consistently reported improvement in his pain with medication and therapy. Due to his noncompliance and inconsistent testimony when compared to the medical evidence, I find his allegations regarding the severity of his pain and functional limitations are not credible.

> The claimant stated he uses a 100 mg Duragesic patch every two days and Soma for muscle spasm. He testified his medications make him dizzy for a couple of hours. Although the claimant testified to side effects of his medication of dizziness, he also testified that he drives

-19-

a 10 mile round trip one day a week to pick up his child from school. He testified his dizziness does not affect his alertness or reflexes or his ability to drive.

(Tr. 21).

The court has addressed the issue and standard of pain as follows:

> 'An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability. . . . there must be medical signs and findings, established by medically acceptable, clinical or laboratory techniques, which show the existence of a medical impairment . . . which could reasonably be expected to produce the pain or other symptoms alleged and which . . . would lead to a conclusion that the individual is under a disability.'

Foster v. Heckler, 780 F.2d. 1125, 1128-29, (4th Cir. 1986) (quoting from the Social Security Reform Act of 1984). See also, SSR 90-1p and Hyatt v. Heckler, 807 F.2d 379 (4th Cir. 1986).

A review of the medicals as set out above does not reveal that plaintiff had any significant limitations as a result of insomnia or hypertension. Dr. Behling noted on September 20, 2004, that plaintiff's hypertension was "stable" and under "much better control" on his medication and that he had encouraged plaintiff to cease smoking. A review of Dr. Behling's office notes beginning October 2, 2001, reveal that it was not noted until May 14, 2003, that his blood pressure had been in the high range over the last "1-2 months." On May 14, 2003, Dr. Behling started plaintiff on Diovan. On July 9, 2003, it was noted that his blood pressure was 139/63 and Dr. Behling noted that he was "doing very well" on the medication with no side effects. On August 19, 2003, Dr. Behling noted that his hypertension had been well controlled on his blood pressure medication. It was also noted that his "Blood pressure is up a little bit today, he forgot to take his medicine for the last two days." (Tr. 261). Dr. Behling also noted that "the importance of strict medication compliance was again reviewed." (Tr. 261). In the office visit of September 22, 2003, Dr. Behling noted that plaintiff's

hypertension was stable on his medication, On April 5, 2004, it was noted that his blood pressure was elevated so his medication was adjusted and on May 21, 2004, it was noted that his "hypertension, doing well" on his medication. (Tr. 258). In the office notes of September 20, 2004, Dr. Behling noted plaintiff had been taking his blood pressure medicine without any problems and his hypertension was stable. (Tr. 257).

As to the insmonia, it was noted by Dr. Rainwater on October 2, 2003, October 7, 2003, and October 9, 2003, that his sleep quality was "good" (Tr. 424, 426, 427); On October 14, 2003, plaintiff specifically stated that "I slept so good" (Tr. 428). In the report of October 30, 2003, Dr. Rainwater states "He reports he is sleeping well to average most nights at this point whereas he has insomnia secondary to pain at the start of biofeedback." (Tr. 433).

A review of the office notes of Dr. Behling reveals that on October 2, 2001, he stated that he gets adequate sleep, and on September 12, 2002, it was noted that he was sleeping better. There were no other entries through September 2004, where plaintiff complained of sleep problems to Dr. Behling, his treating physician. On April 26, 2005, Dr. Thompson noted that Chloral Hydrate had been beneficial in providing plaintiff with a good nights sleep. (Tr. 490). A review of the ALJ's decision reveals that the ALJ noted that in September 2002, plaintiff stated that his sleep had improved. (Tr. 19). The ALJ also noted that the records from McLeod Psychiatric Associates dated July 18, 2002, through January 31, 2003, revealed that plaintiff had improved sleep. The ALJ also noted that in October 2003, the session noted from the Behavioral Health Group revealed plaintiff was sleeping well. (Tr. 20). The ALJ also noted that plaintiff testified that he had problems with depression and "disrupted sleep" but found that these problems dealing with his depression were not

-21-

disabling. (Tr. 22). After a thorough discussion of the medicals and plaintiff's testimony, the ALJ

concluded as follows, in part:

> After careful review of the entire record, I find that the evidence as to
> the claimant's condition, activities, and capabilities, including his
> testimony at rehearing as to pain and other subjective symptoms is not
> consistent with the degree of disabling impairments he alleges.
> Although the claimant has impairments that impose some limitations
> upon his ability to work, the evidence fails to substantiate that his
> impairments, either singly or in combination, are of the severity as to
> preclude the performance of all work-related activities.

(Tr. 23).

There is substantial evidence to support the ALJ's decision as to plaintiff's allegations of pain

and the determination of his credibility. There was a lack of objective medical evidence supporting

plaintiff's claims as to the extent of functional limitations due to his pain and depression. The ALJ's

evaluation of plaintiff's subjective complaints complies with the Fourth Circuit precedent and the

Commissioner's regulations. Further, there is substantial evidence to support the ALJ's decision not

to find that plaintiff's hypertension and/or insomnia significantly limited his ability to work.

Plaintiff's hypertension was controlled on medication and the ALJ discussed the fact that plaintiff

complained of disturbed sleep but found that "Although the claimant has impairments that impose

some limitations upon his ability to work, the evidence fails to substantiate that his impairments,

either singly or in combination, are of the severity as to preclude the performance of all work-related

activities." The ALJ adequately addressed each complaint, as discussed, and explained his

evaluation. Therefore, the undersigned concludes that there is substantial evidence to support the

ALJ's determination as to plaintiff's complaints of pain and his credibility based on the objective

medical evidence. While the plaintiff may have limitations, there is substantial evidence to support

the ALJ's decision that they are not so severe as to preclude him from the demands of work.

Plaintiff argues the ALJ improperly decided that he retained the residual functional capacity for light work ignoring the exacerbation of pain in his lower back and lower extremity that he experiences when he walks or is involved in more than minimal physical exertion. In response, defendant argues the ALJ's finding that plaintiff could perform a reduced range of light unskilled work is supported by substantial evidence. Plaintiff also argues that the ALJ's hypothetical question to the VE failed to consider all of the plaintiff's limitations, including the effects of his insomnia, elevated blood pressure, deficiencies of concentration, the side effects of his medications, and his need to take frequent breaks due to fatigue and relief of pain.

As previously discussed, there is substantial evidence to support the ALJ's determination as to plaintiff's complaints of pain and his credibility based on the objective medical evidence. While the plaintiff may have limitations, there is substantial evidence to support the ALJ's decision that they are not so severe as to preclude him from the demands of all substantial gainful activity. The ALJ concluded that the plaintiff could not perform all requirements of light work in that he is impeded by additional exertional and/or non-exertional limitations. Specifically, the ALJ found restrictions that plaintiff would require simple, routine work in a low stress environment, which the ALJ defines as requiring few decision, and only occasional interaction with the public due to his depression and pain. Due to his post laminectomy syndrome and chronic back pain, the ALJ found plaintiff limited to occasional balancing, stooping, kneeling, crouching, and crawling; occasional climbing of stairs or ramps, no climbing of ladders, ropes, or scaffolds, and a sit/stand option of one hour at a time; and due to possible side effects of his medication, he should avoid working around hazards such as unprotected heights and dangerous machinery. Furthermore, the ALJ stated as follows:

My conclusion that the claimant is not "disabled" is supported by the February 3, 2005, statement of the claimant's treating physician, Dr. Hugh Thompson, who suggested the claimant obtain technical training for another type of occupation comparable with his back condition. This statement indicates the claimant was capable of working in a less strenuous position. The claimant's concurrence with Dr. Thompson's statement also indicated the claimant felt able to work in a less strenuous job. My conclusion is also supported by the Healthsouth functional capacity evaluation which demonstrates the claimant was capable of medium exertional activity. Furthermore, my conclusion that the claimant is not disabled is also supported by the opinions of the State agency medical consultants. As those of nonexamining physicians, their opinions are not entitled to controlling weight, but must be considered and weighed as those of highly qualified experts in the evaluation of the medical issues in disability claims under the Social Security Act.

(Tr. 25-26).

The purpose of a vocational expert's testimony is to assist the ALJ in determining whether jobs exist in the economy which a particular claimant could perform.  Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989).  The ALJ found that the plaintiff has the residual functional capacity to perform light work with restrictions. (Tr. 26). There is substantial evidence to support this conclusion, including but not limited to, the Functional Capacity Evaluation performed at Healthsouth concluding plaintiff could perform work in the medium category with occasional positional tolerances but unable to return to former work, and the fact that his treating pain management physician, Dr. Thompson, recommended that he attend Florence-Darlington Technical School to "perhaps training for some occupation which would be compatible with this low back condition." (Tr. 490). Dr. Thompson did not place any restrictions or limitations on his activities. Dr. Rhea, his treating neurosurgeon, who released him at maximum medical improvement on May 16, 2002, recommended a 20% medical impairment rating based on his persistent severe back pain and radicular symptoms. Dr. Rhea also did not place any restrictions on the plaintiff's activities.

-24-

Additionally, the ALJ limited plaintiff to occasional balancing, stooping, kneeling, crouching and crawling, occasional climbing of stairs or ramps, no climbing of ladders, ropes, or scaffolds, and a sit/stand option of one hour at a time. Further, the ALJ considered plaintiff's allegations of side effects from his medication and limited plaintiff to avoid working around hazards such as unprotected heights and dangerous machinery. As the ALJ concluded plaintiff could not return to his past relevant work, the burden shifted to the Commissioner to show other work existed in significant numbers in the national economy that she could perform.  The Commissioner met this burden through the testimony of VE. (Tr. 538-545).

The ALJ  presented a  hypothetical to the VE based on an individual of claimant's age, work experience, education and residual functional capacity to perform limited light exertional work with simple routine work because of depression and pain along with the other restrictions as set out above. The VE named several jobs the plaintiff could perform. The ALJ then posed a second hypothetical in which he stated the following:

> Now, assume a guy, an individual is limited to sedentary exertional work as defined in the regulations, and assume an individual of the claimant's education, past job experience, with the same restrictions I gave you at the light level. Not including the sit/stand option. Can you identify jobs?

(Tr. 541).

The VE still responded with jobs the plaintiff could perform even at the sedentary level. The ALJ is required to set out the claimant's physical and mental impairments.  The ALJ need not treat every allegation of impairment by claimant as fact; the ALJ is entitled and required to make factual determinations on disputed conditions.  As set out above, the ALJ found claimant's claim of total disability not entirely credible and there is substantial evidence to support that finding. The ALJ

posed a hypothetical to the expert based on those allegations of impairment which the ALJ concluded were credible and supported by evidence in the record. Based on the testimony of the vocational expert, the ALJ held there were relevant jobs in the national economy, in significant number, which the plaintiff could perform. Therefore, the ALJ properly relied on the VE's testimony in finding that the plaintiff was not disabled because he could perform jobs that existed in significant numbers (Tr. 21). Lee v. Sullivan, 945 F.2d 687, 693-694 (4th Cir. 1991). Accordingly, the undersigned finds that the ALJ's hypothetical to the VE was not defective but was supported by substantial evidence.

## VI. CONCLUSION

Despite the plaintiff's claims, he has failed to show that the Commissioner's decision was not based on substantial evidence. Based upon the foregoing, this court concludes that the ALJ's findings are supported by substantial evidence and recommends the decision of the Commissioner be affirmed. Therefore, it is

RECOMMENDED that the Commissioner's decision be AFFIRMED.

Respectfully submitted,

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

July 24, 2007
Florence, South Carolina

**The parties' attention is directed to the important notice on the next page.**

-26-